## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

**PATRICIA EPOLITO,**

      **Plaintiff,**

**vs.**                                                    **Case No.: 3:06-cv-628-J-16MCR**

**THE PRUDENTIAL INSURANCE
COMPANY OF AMERICA,**

      **Defendant.**

_____/

## <u>ORDER</u>

This cause is before the Court for consideration of the parties' Motions for Summary Judgement. Plaintiff, Ms. Patricia Epolito filed two separate Motions for Summary Judgment, one dispositive ("Plaintiff's Motion") (Dkt. 41) and one partial (the "Partial Motion") (Dkt. 26) (collectively "Plaintiff's Motions"). Defendant, the Prudential Insurance Company of America filed the other one. (Dkt. 31). Plaintiff filed a response to Defendant's Motion for Summary Judgment (Dkt. 42) and Defendant filed a single comprehensive response to Plaintiff's Motions (Dkt. 43).

By their cross-motions, the parties each seek summary judgment as to Plaintiff's Complaint (Dkt. 1) for the recovery of benefits, enforcement of rights and clarification of rights to future benefits under a plan governed by the Employee Retirement Income Security Act of 1974 ("ERISA" or the "Act"), 29 U.S.C. §§ 1001-1381.

For the reasons that follow, Plaintiff's Motion ((Dkt. 41) is **GRANTED**; the Partial Motion (Dkt. 26) is **DENIED**; and, Defendant's Motion for Summary Judgment (Dkt. 31) is **DENIED**.

## I.    Factual History[1]

The undisputed facts establish that Plaintiff was employed beginning on January 1, 2003, by Human Resources of Kemper Auto and Home, a Unitran Company ("Kemper Independence/Unitrin") as a Regional Operations Manager.[2]  As an employee of Kemper Independence/Unitran, Plaintiff was provided with the Kemper Independence/Unitran Long Term Disability ("LTD") Plan (the "LTD Plan").  The LTD Plan is a welfare benefit plan covered by ERISA, which is funded through an insurance policy issued by Defendant to Unitran, Inc.

Plaintiff was previously employed by Kemper Independence/Unitrin's predecessor, Kemper Insurance Companies ("Kemper") from February 7, 1977 until December 31, 2002.[3]  While employed at Kemper, Plaintiff enrolled in a pension plan named the "Kemper Retirement Plan."

---

[1] Defendant filed a copy of the Administrative Record with the Court.  See (Dkt. 32). Designations to the Administrative Record are cited as "A.R." followed by a page number.

[2] Plaintiff lists her title as Customer Service/Billing Manager in their Collections-Migration.  See (Dkt. 26 at p.1).

[3] Plaintiff was offered her position with Kemper Independence/Unitrin following Kemper's sale of its personal lines insurance business to Unitran, Inc. on June 28, 2002.

On February 3, 2003, Plaintiff left her job as Regional Operations Manager due to among other things Graves' Disease resulting in thyroid ophthalmopathy,[4] diplopia,[5] dry eyes, nuclear sclerotic cataracts and decreased eyesight.  Plaintiff's chief and recurring complaint is that she cannot focus on written words after a short period of time because diplopia or double vision occurs.  (A.R. 379, 384).  As Regional Operations Manager, Plaintiff was required to spend over 90% of her day reading papers and reports in order to prepare manuals and ensure quality compliance.  (A.R. 352, 375, 379).

Plaintiff filed a claim for disability insurance benefits pursuant to the LTD Plan.  The parties do not dispute that Plaintiff's claim is based on the conditions listed above.  Defendant paid Plaintiff short-term disability ("STD") benefits, and approved LTD benefits, in the amount of $3,891.97 per month for the period from August 2, 2003 through August 31, 2005.  At Defendant's request, Plaintiff also filed an application with the Social Security Administration ("SSA") for social security disability benefits ("SSDB") for the conditions listed above and depression.  Plaintiff's SSDB application was denied initially and again on appeal.

---

[4] Graves' Disease, first described by Sir Robert Graves in the nineteenth century, is a common thyroid problem that is more likely to develop in women than men.  Graves' Disease causes eye trouble usually in the form of inflamed eye muscles and tissues.  Eye muscles weakened by long period of inflammation can lose their ability to control movement resulting in double vision.  See http://www.webmd.com/a-to-z-guides/understanding-graves-disease-basics.

[5] Diplopia is defined in the Merriam-Webster Dictionary as a "disorder of vision in which two images of a single object are seen (as from unequal action of the eye muscles) - - called also 'double vision.'"  See http://www.merriam-webster.com/dictionary/diplopia.

Through a letter dated July 26, 2005 (the "Denial Letter")(A.R. 66-68), Defendant advised Plaintiff that her benefits would be terminated as of August 1, 2005.[6] Defendant explained that it determined Plaintiff was not totally disabled as defined under the LTD Plan. The Denial Letter also informed Plaintiff that she had the right to appeal Defendant's decision.  Plaintiff appealed.

On March 14, 2006, Defendant advised Plaintiff that it had completed review of her claim and denied her appeal for a continuation of benefits.  (A.R. 69-71).  By this letter, Defendant also advised Plaintiff that she had the option of filing a second appeal or filing a civil action under ERISA.  Plaintiff filed this ERISA action.

On July 10, 2006, Plaintiff filed her Complaint (Dkt. 1) with this Court pursuant to section 502(a) of ERISA, 29 U.S.C. § 1132(a)(1)(B). Plaintiff argues that Defendant wrongfully terminated her LTD claim.  Plaintiff seeks to be placed back in benefit.  Plaintiff also seeks all past due benefits from September 1, 2005, forward in the amount of $3,596.16 per month, prejudgment interest and attorney's fees and costs.

Plaintiff argues in the Partial Motion that the LTD Plan does not require her to offset any benefits potentially received by retirement pension benefits from Plaintiff's former employer, Kemper.[7]  Plaintiff makes this final argument in response to Defendant's Answer. (Dkt. 9).  In the Answer, Defendant set out its affirmative defenses.  Through its Third and

---

[6] Defendant paid Plaintiff additional LTD benefits through August 31, 2005. (A.R. 67).

[7] Plaintiff acknowledges that the LTD Plan requires her to offset her LTD benefits with any Social Security Disability payments and pension benefits received from the employer who sponsored the LTD Plan, Kemper Independence/Unitran.

4

Fifth Affirmative Defenses Defendant claims that it is entitled to certain offsets under the LTD Plan if an award of benefits is appropriate in this case. Plaintiff seeks summary judgment as to Defendant's Third and Fifth Affirmative Defenses, to "include a ruling that [Defendant] may not reduce her LTD benefits by the amount of her pension from Kemper. (Dkt. 26 at p. 2). Plaintiff also claims that the Court can consider evidence from outside of the claims file or administrative record when considering her offset argument.

Defendant filed a cross-motion for summary judgment (Dkt. 31) and a response to Plaintiff's Motions. (Dkt. 43). Through these pleadings, Defendant argues that its decision to terminate Plaintiff's LTD benefits was legally correct. Defendant further argues that even if the decision was not correct, it was reasonable and should stand under an arbitrary and capricious standard of review or heightened arbitrary and capricious standard. Defendant also seeks an award of attorney's fees and costs.

In response to the Partial Motion, Defendant claims that if the Court determines Plaintiff is entitled to LTD benefits, remand of Plaintiff's LTD claim is appropriate. Defendant states that it was never allowed an opportunity to make a determination about offsets to Plaintiff's LTD benefits. Defendant further claims that prior to the filing of this suit, Plaintiff never advised Defendant that she was contemporaneously receiving pension benefits while also receiving LTD benefits under the LTD Plan. Finally, Defendant claims that under Eleventh Circuit precedent Plaintiff cannot improperly supplement the administrative record with documents and evidence not considered by Defendant during the administration of Plaintiff's LTD claim.

## II.    Standard of Review

In an ERISA case, the Court does not take evidence.  Instead its role is to evaluate the reasonableness of the administrative determination in light of the record compiled before the plan fiduciary.  Curran  v. Abbott Labs. Extended Disability Plan, 2005 WL 894840 (11th Cir. Mar. 16, 2005) ("[In an ERISA benefit denial case . . . the district court sits more as an appellate tribunal than as a trial court.").

Because ERISA "does not contain a body of contract law to govern the interpretation and enforcement of employee benefit plans," disputes over benefits are governed by "federal common law" on the many matters not addressed by the statute.  Hauser v. Life Gen. Sec. Ins. Co., 56 F.3d 1330, 1333 (11th Cir. 1995).  Under the federal common law of ERISA, a court adjudicating an action for benefits will apply one of three standards of review: (1) *de novo* where the claim administrator lacks discretionary authority to decide claims for benefits; (2) arbitrary and capricious where the plan terms grant such discretion to the administrator; or (3) "heightened" arbitrary and capricious where the administrator has discretion but also has a conflict of interest because it is the entity paying the claims that it decides.  See Williams v. BellSouth Telecommuns., Inc., 373 F.3d 1132, 1134-35 (11th Cir. 2004).

In Williams, this Court summarized these standards, and offered guidance regarding how to determine which one to apply, by providing the following multi-stage analysis for ERISA benefits cases:

1. Apply the *de novo* standard to determine whether the claim administrator's benefits-denial decision is "wrong" (*i.e.,* the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.

2. If the administrator's decision is in fact "*de novo* wrong," then determine whether the administrator was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.

3. If the administrator's decision is "*de novo* wrong" and it *was* vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported the decision (hence, review the decision under the more deferential arbitrary and capricious standard).

4. If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds exist, then determine if the administrator had a conflict of interest.

5. If there is no conflict, then end the inquiry and affirm the decision.

6. If there is a conflict, then apply heightened arbitrary and capricious review to the decision to affirm or deny it.

Id. at 1137-38.

It is undisputed here that Defendant had discretion to decide claims for benefits under the applicable insurance policy.  It also had a conflict of interest, as defined by the Eleventh Circuit, because it was responsible for paying claims, as well as deciding them.  Accordingly, the proper standard of review in this case is the "heightened arbitrary and capricious standard."  See Williams, 373 F.3d at 1134-35.

Under the heightened arbitrary and capricious standard, the court's initial threshold inquiry is to perform a *de novo* [8] review to determine if the administrator's benefits decision

---

[8] *De novo* in this context means that a court reviews the denial of a plaintiff's claim based on the administrative record without deference or any presumption of correctness.  Accordingly, the term, *de novo*, when used to refer to the court's initial review under the heightened arbitrary and capricious standard, does not mean exactly the same thing as when the term is used to

was "wrong." Id. at 1138-39.[9]  If the initial *de novo* review results in the conclusion that the benefits decision was not "wrong," then the decision must be upheld and summary judgment is entered for the administrator. See Williams, 373 F.3d at 1139 (affirming summary judgment for administrator after determining that benefits decision was not "*de novo* wrong").

ERISA benefit denial cases present courts with unique considerations.  Hence, the "standard" summary judgment considerations do not apply.  "Where the decision to grant or deny benefits is reviewed for abuse of discretion, a motion for summary judgment is merely the conduit to bring the legal question before the district court and the usual tests of summary judgment, such as whether a genuine dispute of material fact exists do not apply." See Crume v. Metropolitan Life Ins. Co., 417 F. Supp. 2d 1258, 1272 (quoting Bendixan v. Standard Ins. Co., 185 F.3d 939, 942 (9th Cir. 1999); see also Fish v. Unum Life Ins. Co. of Am., 2005 WL 3186089 *13 (M.D. Fla. Nov. 29, 2005).  Instead, the Court must ask whether the aggregate

---

describe one of the three ERISA standards of review.  See McClurg v. Hartford Life and Accident Ins. Co., 2006 WL 2801878 *8, n.5 (internal citations omitted).

[9] Under the heightened arbitrary and capricious standard:

> [A] wrong but apparently reasonable interpretation is arbitrary and capricious if it advances the conflicting interest of the fiduciary at the expense of the affected beneficiary or beneficiaries unless the fiduciary justifies the interpretation on the ground of its benefit to the class of all participants and beneficiaries.

Godfrey v. BellSouth Telecommuns., Inc., 89 F.3d 755, 758 (11th Cir. 1996) (quotations omitted).  This principle is limited by an important precondition, "[t]he fiduciary's interpretation first must be 'wrong' from the perspective of a *de novo* review." Id. (quotations omitted).

evidence, viewed in the light most favorable to the non-moving party, could support a rational determination that the plan administrator acted arbitrarily in denying the claim for benefits. <u>Crume</u>, 417 F. Supp. 2d at 1273, n.11. As Judge Ann Conway succinctly stated in <u>Crume</u>, "[i]n a case like this, where the ultimate issue to be determined is whether there is a reasonable basis for a claims administrator's benefits decision, it is difficult to ascertain how the "normal"summary judgment rules can apply." <u>Id</u>.

## III.   Procedural Determinations

The parties' memoranda and responses present the Court with two procedural considerations. First, the parties disagree as to the application of the heightened arbitrary and capricious standard. Second, through the Partial Motion (Dkt. 26), Plaintiff asks the Court to address her offset arguments and determine her exact benefits when considering the parties cross motions for summary judgment. The parties also disagree as to whether the Court can consider material from outside of the Administrative Record when evaluating the parties' offset arguments or whether remand of the issue to Defendant is proper.

Based on the Court's conclusions below, the first issue is moot. As it may be relevant later, the Court addresses it here. The parties agree that the heightened arbitrary and capricious standard is appropriate in this case. (Dkt. 41 at p. 19 and Dkt. 43 at p. 5). The parties disagree as to the application of "burden-shifting" under that standard. Citing to various cases, including <u>Brown v. Blue Cross & Blue Shield, Inc.</u>, 898 F.2d 1556 (11th Cir. 1990), Plaintiff claims that under the heightened arbitrary and capricious standard of review:

> the burden shifts to the claims administrator to prove that its interpretation of the plan is not tainted by self-interest . . . . The claims administrator satisfies this burden by showing that its wrong but reasonable interpretation of the plan benefits the class of participants and beneficiaries . . . . If the claims administrator fails to show that its plan interpretation benefits the class of participants and beneficiaries, the claims administrator's plan interpretation is not entitled to deference . . . .Even when the administrator satisfies this burden, the claimant may still be successful if he can show by other measures that the administrator's decision was arbitrary and capricious.

(Dkt. 41, pp.19-20).

Defendant does not disagree with burden-shifting in principle. Defendant disagrees with Plaintiff's characterization of the burden "standard." Defendant suggests that in the Eleventh Circuit, a court should evaluate an administrator's actual handling of the claim to determine if the decision to deny LTD benefits was "thorough and evenhanded." (Dkt. 43 at p.10).

Both parties are technically correct. Plaintiff cites to the burden-shifting principle established for cases concerned with plan interpretation. Defendant cites to the correct principle for factual determination cases. Because this is a factual determination case, Defendant's argument prevails.[10]

Plan interpretation refers to a plan administrator's interpretation of the plan language. Factual determination refers to the plan administrator's interpretation of the facts in the record. Here Plaintiff does not claim that a clause or word in the LTD Plan is ambiguous.

---

[10] Plaintiff claims in her filings that the plan administrator's interpretation of the plan is wrong. See, e.g., Dkt. 41 at p. 11. However, this is clearly a factual determination case. Plan interpretation is only triggered in the Partial Motion through the parties' disagreements about the treatment of offsets under the LTD Plan.

Instead Plaintiff contends that the evidence presented, the facts in the record, make clear that she is disabled under the LTD Plan.

The parties disagreement on this issue is understandable. As witnessed by discussions on the subject in cases such as Seger v. Reliastar Life, 2005 WL 2249905 (Sept. 14, 2005, N.D. Fla) the Eleventh Circuit has yet to provide district courts with an exact analytical framework for reviewing a plan administrator's factual determinations. Until that guidance is forthcoming, the Court will utilize the analytical model adopted by the court in Seger to review a conflicted administrator's factual determination.

In Seger the court concluded that:

> where "heightened arbitrary and capricious review of a conflicted administrator's factual determination is required, Brown's two step inquiry must seek to more realistically evaluate the fairness of the factual determination. The fundamental burden shifting framework employed by the Brown court can be applied. An administrator's decision to deny benefits that was supported by reasonable grounds in the record, but which also rejects credible evidence of disability submitted by the claimant has the practical effect of advancing the administrator's self-interest, and the burden shifts to the administrator "to prove that its decision was not tainted by self interest." Brown, 898 F.2d at 1556-67. The administrator can carry this burden by demonstrating the thoroughness and evenhandedness with which the claims review process was conducted. Evidence of procedural anomalies, reversing an initial grant of benefits without receiving additional evidence, self-serving selectivity in the use of evidence, or an apparent bias in decision-making to the benefit of the insurer are all relevant factors in assessing whether the decision-making process was tainted by self-interest. See, e.g., Pinto v. Reliance Std. Life Ins. Co., 214 F.3d 377, 393 (3d Cir. 2000) (in applying heightened arbitrary and capricious review to conflicted administrator's factual determinations "we look not only at the result - whether it is supported by reason - but at the process by which the result was achieved."); Russell v. Paul Revere Life Ins. Co., 148 F. Supp. 2d 392, 406 (D. Del. 2001). Whether the decision was supported by an

independent medical evaluation, where available under the terms of the plan, may also demonstrate the objectiveness of the claim evaluation.

<u>Seger</u>, 2005 WL 2249905 at *14.

Defendant also prevails on the second issue, which Plaintiff raised in the Partial Motion. ERISA provides the Court's with the means to review an administrator's decisions. It does not allow the Court to make those decisions. This is exactly what Plaintiff would have the Court do if we agreed to consider Plaintiff's offset arguments without first allowing Defendant a chance to determine what Plaintiff's LTD benefits should be. Remand of the matter is proper and will allow Defendant to make an informed decision based on all of the evidence compiled to date. Thus, the Court declines to consider this issue without first allowing Defendant the opportunity to review the terms of the LTD Plan and calculate Plaintiff's LTD benefits. Remand is proper and the Partial Motion (Dkt. 26) is **DENIED**.

**IV.    Analysis**[11]

The LTD Plan, reads in pertinent part:

You are disabled when [Defendant] determines that:

- you are unable to perform the material and substantial duties of your regular occupation due to sickness or injury; and

- you have a 20% or more loss in your indexed month earnings due to that sickness or injury.

After 24 months of payments, you are disabled when [Defendant] determines that due to the same sickness or injury, you are unable to

---

[11] When conducting the initial *de novo* review, the Court will confine its analysis to the materials contained in the Administrative Record.

perform the duties of any gainful occupation for which you are reasonably fitted by education, training or experience.

***

Gainful occupation means an occupation, including self employment, that is or can be expected to provide you with income equal to at least 50% of your indexed monthly earnings within 12 months of your return to work.

In order to be eligible for LTD benefits beyond the 24 months allotted, medical information in Plaintiff's file must support an impairment that would render Plaintiff totally disabled from performing her occupation or any other gainful occupation. (A.R. 66).

Plaintiff claims that she is disabled under the LTD Plan because she suffers from Grave's Disease resulting in thyroid ophthalmopathy, diplopia, dry eyes, nuclear sclerotic cataracts and decreased eyesight. (A.R. 358, 375). Plaintiff claims these diseases prevent her from being able to focus on reading material without suffering from double vison. (A.R. 358). Plaintiff also suffers from extremely dry and bloodshot eyes due to lid retraction, as well as lateral rectus muscle enlargement and eyelid swelling. (A.R. 358, 375).

In the Denial Letter, Defendant finds Plaintiff is not disabled, stating:

In an effort to clarify your condition[,] medical records were obtained from Dr. Levine and Shmunes. The records indicate you have been treating for thyroid ophthalmoscopy related to a history of Graves['] disease. Throughout the records you continue to complain of double vision at near. Your distance vision is noted to fluctuate between 20/25 and 20/40 in the left eye, and is consistently noted to be 20/25 in the right eye. There were no indications as to your near visual acuity throughout the records. Both Dr. Levine and Dr. Shmunes consistently note throughout the records that you are not a candidate for corrective surgery at this time. There are no referrals to ocular motility specialists noted and no changes in the prism power of your glasses noted as well.

13

In an office visit with Dr. Levine on July 12, 2005[,] you reported no double vision with glasses unless you are tired.  Your intraocular pressure has remained within normal limits on your current medication regimen.  There are no retinal changes related to thyroid disease noted throughout the file as well.  Based on the information in the file, there is not sufficient evidence to support your complaints of severe double vision.

After a [t]horough evaluation of the above information, we have determined that as of August 1, 2005, you no longer met the definition of being Totally Disabled from performing the duties of your own occupation . . . .

(A.R. 67).

## A.    Plaintiff's Medical Records

Plaintiff's complete medical history is set forth in the Administrative Record and Plaintiff's memoranda.  By way of summary, Plaintiff submitted the reports of several doctors in support of her claim - Dr. Steven Lancaster, OD; Dr. Neil Shmunes, MD; Dr. Alan Lessner, MD; and, Dr. Lawrence Levine, MD.

### Dr. Lancaster and Dr. Shmunes

In February 2003,[12] Plaintiff began treatment at the Atlantic Eye Institute with both Dr. Lancaster, an Optometrist and Dr. Shmunes, an Ophthalmologist.[13] Plaintiff complained of difficulty reading and focusing after reading for three minutes. (A.R. 338). A February 2, 2003, MRA (magnetic resonance angiogram) of Plaintiff's intracranial circulation revealed a common anatomical variant of a markedly dominant left vertebral artery. (A.R. 341). An MRA of Plaintiff's orbits taken the same day revealed asymmetric enlargement of the right superior rectus/levator palpebrae complex (A.R. 340), as well as symmetric enlargement of the lateral recti muscles consistent with thyroid orbitopathy, and a persistent asymmetric enlargement of the right lacrimal gland. (A.R. 340). A February 6, 2003, MRI (magnetic resonance image) of Plaintiff's brain stem showed an 8 mm mucous retention cyst or polyp at the roof of the right maxillary antrum near the orbital apex. (A.R. 339).

In a letter dated March 12, 2003, Dr. Lancaster advised Defendant that Plaintiff suffered from diplopia that was secondary to thyroid ophthalmopathy and dry eyes. (A.R. 3111-312). Plaintiff's best corrected visual acuity was OD 20/20 and OS 20/20. Extra-ocular motility showed intermittent vertical acuity with a right intermittent hypertropia. (A.R. 311-312). Dr. Lancaster started Plaintiff on glaucoma medication in her right eye to

---

[12] In his letter to Defendant dated January 16, 2006, Dr. Lancaster writes that he has been seeing Plaintiff since August 20, 2002. (A.R. 154).

[13] Plaintiff claims that Dr. Lancaster is a Board Certified Ophthalmologist. He is not. Dr. Lancaster is an O.D., which means that he received his Doctor of Optometry degree (O.D.). Optometrists provide patients with primary vision care. Optometrists should not be confused with Ophthalmologists. Ophthalmologists are physicians who have earned a Medical Degree (M.D.). Ophthalmologists can provide primary vision care and perform surgery. See U.S. Dept. of Labor Bureau of Statistics at http://www.bls.gov/oco/ocos073.htm.

reduce her ocular pressure and recommended that Plaintiff seek a second opinion from a specialist.  While Dr. Lancaster did not indicate whether Plaintiff was totally disabled from working at her regular occupation, he did state that Plaintiff's condition could be variable and could result in significant diplopia prohibiting her from functioning at her maximum level. (A.R. 311-312).

In a letter dated May 16, 2003, Dr. Lancaster updated Defendant on Plaintiff's condition.  Dr. Lancaster listed Plaintiff's complaints and notes that Plaintiff is unable to focus on reading material for any significant time.  Hoping that surgery might help Plaintiff's case, Dr. Lancaster recommends that Plaintiff seek treatment with Dr. Levine, an Ophthalmologist working at the University of Florida who specializes in strabismus and extraocular muscle surgery.  (A.R. 320-321).  Dr. Lancaster refers to Plaintiff's condition as chronic and concludes that he expects to continue to treat Plaintiff often in future months if not years.  Dr. Lancaster ends his letter with the recommendation that Defendant continue Plaintiff on disability.  (A.R. 319).

Dr. Lancaster continued to update Defendant on Plaintiffs condition through letters dated June 3, 2003 and July 10, 2003.   (A.R. 314-315; 308-309).   In his June 3 correspondence, Dr. Lancaster writes that Plaintiff's "particular condition can be variable and can result in significant diplopia, which prohibits a patient from functioning at their maximum level on a day-to-day basis. (A.R. 312).  In his July 10 letter, Dr. Lancaster writes that Plaintiff's condition is fairly stable.

16

Plaintiff visited Dr. Lancaster again on August 6, 2003, for a follow up appointment. (A.R. 306). After this visit, Plaintiff did not seek treatment at Atlantic Eye Institute again until March 16, 2004 (the "March 16 visit"). At the March 16 visit, Plaintiff indicated that her condition was "no better or worse" since her last visit in August 2003. (A.R. 261). Following the March 16 visit, Plaintiff was treated at Atlantic Eye Institute on April 15, 2004, May 21, 2004, July 20, 2004, April 11, 2005 and June 28, 2005. (A.R. 260, 263, 262, 167 and 166 respectively).

On January 16, 2006, Dr. Lancaster submitted a letter to Plaintiff's former counsel in which he opined that Plaintiff was not employable and most likely would be unable to return to work in the future. (A.R. 154-155). Dr. Lancaster also noted that Plaintiff's reading ability was severely limited because she could not maintain focus with her eyes without double vision or asthenopia[14] for more than a few seconds. Dr. Lancaster also found that using the computer caused Plaintiff great fatigue and that with her condition driving might not be safe for Plaintiff. Dr. Lancaster writes that Plaintiff's thyroid ophthalmopathy would not improve in the future but rather would deteriorate. Dr. Lancaster concludes that he and Dr. Levine did not recommend ocular surgery due to the variability in measurements as a result of [Plaintiff's] thyroid ophthalmopathy. He also writes that he and Dr. Levine do not believe that surgery will be a sufficient remedy in the future for Plaintiff. (A.R. 154).

---

[14] Asthenopia is defined in <u>Merriam-Webster's Medical Dictionary</u> as "weakness or rapid fatigue of the eyes often accompanied by pain and headache." <u>See</u> http://www.m-w.com/medical/ asthenopia.

**Dr. Lessner**

Plaintiff was treated by Dr. Lessner on April 24, 2003. Dr. Lessner is an Ophthalmologist who specializes in ophthalmoplastic and reconstructive surgery. Dr. Lessner referred Plaintiff to Dr. Levine for treatment.

**Dr. Levine**

Plaintiff began treatment with Dr. Levine on May 20, 2003. (A.R. 317-319). Dr. Levine is a Board Certified Ophthalmologist and strabismus specialist.[15] Dr. Levine found that Plaintiff suffered from Graves' Disease, thyroid ophthalmopathy and diplopia. He recommended that Plaintiff continue to wear prism glasses. Although he found Plaintiff would continue to experience intermittent diplopia and eye strain and expected Plaintiff to need surgery in the future, he also found that Plaintiff was not currently candidate for surgery. (A.R. 317-319). Dr. Levine noted that Plaintiff's exam revealed that she was in the active phase of the disease and that it was "best to follow these patients for a period of time until they are less active and 'settle out' into constant ocular deviation." (A.R. 318).

On July 25, 2003, Dr. Levine found Plaintiff's condition unchanged, but noted that she still had trouble focusing "at near." (A.R. 300-301). At Plaintiff's November 19, 2003, appointment, Dr. Levine again found Plaintiff's condition unchanged and noted that Plaintiff was not an eye muscle surgical candidate at this time. (A.R. 274). Dr. Levine further recommended that Plaintiff continue wearing her prism glasses. (A.R. 300-301).

---

[15] Strabismus is defined in <u>Merriam-Webster's Dictionary</u> as the "inability of one eye to attain binocular vision with the other because of imbalance of the muscles of the eyeball. <u>See</u> http://www.merriam-webster.com/dictionary/strabismus.

On March 10, 2004, Dr. Levine noted that Plaintiff was not able to read for periods of more than five minutes even with prisms and she is not able to work/read because the image gets distorted.  (A.R. 176).  On April 27, 2004, Dr. Levine completed a work status form for Plaintiff on which he indicated that Plaintiff's subjective complaints of double vision when reading or using a computer were consistent with his objective medical findings that Plaintiff had a small ocular misalignment.  (A.R. 265-266).

On November 1, 2004, Dr. Levine noted Plaintiff's visual tracking issues and recommended against surgery for Plaintiff at this time.  (A.R.175).  At Plaintiff's July 12, 2005, visit, Dr. Levine again notes that Plaintiff is not a surgical candidate at this time.  (A.R. 173).

Dr. Levine saw Plaintiff for a follow-up visit on January 16, 2006.  (A.R. 156).  In his letter dated that same day, Dr. Levine writes that Plaintiff's condition "is chronic and a lifetime condition."  (A.R. 156).  Dr. Levine concludes his letter with the statement that "at this time I do not have a surgery to offer."  (A.R. 156).

## B.      Additional Materials

On August 3, 2004, the SSA denied Plaintiff's application for disability benefits.  (A.R. 249-252).  Plaintiff appealed this decision.  On January 19, 2005, Plaintiff's appeal was denied.  (A.R. 231-233).  In both its initial denial and denial of Plaintiff's appeal (using similar language), the SSA wrote it was denying Plaintiff's application and appeal because:

> You state that you are disabled and unable to work because of thyroid ophthalmopathy - double vison and depression.  We have reviewed the medical record, and it shows that you have received treatment for your

condition and that you may not be capable of performing heavy work. We realize that you feel that you are not capable of working at this time. However, the medical record shows that you are able to communicate, act in your own interests, adjust to ordinary emotional stresses, get along with others and do your usual daily activities without assistance. The medical record shows that you are capable of performing other work that does not require heavy lifting. Therefore your claim for disability is denied.

(A.R. 251, 233).

**Vocational Assessment**

On July 12, 2005, Plaintiff completed a vocational self-assessment called a "Vocational Rehabilitation Education and Employment Form" (the "VOC Form") as required by Defendant. On her VOC Form Plaintiff indicates that she can prepare her own meals; drive up to 25 miles per trip; and, do her own housework, bills gardening, laundry and clothing shopping. However, Plaintiff qualifies her abilities by noting that she can manage her bills because she only has four bills to pay (A.R. 380) and relies on telephone banking. (A.R. 212). Plaintiff qualifies her ability to drive stating that she can drive only because she does not have as much of a problem with the "distance sight" required to drive. (A.R. 212).

**William J. Gray - Vocational Assessment**

On January 19, 2006, Plaintiff obtained a vocational assessment from William J. Gray of W.J. Gray Consulting. Mr. Gray is a licensed rehabilitation counselor. Prior to rendering his opinion, Mr. Gray reviewed Plaintiff's medical records and discussed Plaintiff's condition with Dr. Lancaster. After his review, Mr. Gray concluded that Plaintiff was totally unemployable on the open labor market and that she was capable of reading only at a second

grade level.  (A.R. 159-161).  Mr. Gray made his assessment of Plaintiff's reading skills after reviewing Plaintiff's performance on the standardized Gates MacGinitie Test of Reading (the "Gates MacGinitie Test").  Mr. Gray's letter provides an overview of the format of the Gates MacGinitie Test and a summary of how he determined Plaintiff's current reading level based on her poor performance on the Gates MacGinitie Test.

### C.      Defendant's Medical Records

In support of its position that the decision to terminate benefits was legally correct Defendant submits reports from Dr. Jill Fallon and Dr. Martin Gizzi.  In addition, the Administrative Record also contains Defendant's "Subjective-Objective-Analysis-Plan" ("SOAP") notes and case file telephone logs[16] (collectively, the "SOAP Notes").

### Dr. Fallon

Dr. Fallon is Defendant's in-house physician.  Dr. Fallon is not an Ophthalmologist and the Administrative Record does not provide any details about her medical specialty or practice area(s).  After reviewing Plaintiff's file, Dr. Fallon concluded rather summarily that any "severe or disabling impairment related to the [Plaintiff's] complaints is not supported by the medical documentation." (A.R. 369).

### Dr. Gizzi

---

[16] The telephone logs track conversations Defendant had with Plaintiff and Plaintiff's health care providers.

Dr. Gizzi is a Neuro-Ophthalmologist. (A.R. 151). According to Plaintiff, Dr. Gizzi is not a surgeon. (Dkt. 41 at 15; Dkt. 42 at 7, n.15). Defendant hired Dr. Gizzi to review Plaintiff's medical records. In conducting that review, Dr. Gizzi never directly examined or met with Plaintiff. Upon completion of his review of Plaintiff's medical records, Dr. Gizzi opined that Plaintiff's reading would only be slowed by 25% and that "no other functional impairments are expected." (A.R. 146). Dr. Gizzi's review does not provide any objective basis to support his determination that Plaintiff's reading would only be slowed by 25%.

**D.      Other Administrative Record Materials**

**SOAP Notes**

In addition to the opinions offered by Dr. Gizzi and Dr. Fallon, Defendant asks the Court to consider Defendant's SOAP Notes as evidence that Defendant's decision to deny Plaintiff's LTD claim was thorough and evenhanded. The SOAP Notes were apparently compiled by Ms. Carleen Gambino, the Claim's Manager assigned by Defendant to manage Plaintiff's file and Ms. Cheryl McDermott, Defendant's in-house Nurse Practitioner.

As demonstrated below, the SOAP Notes are not a model of consistency as they contain a range of findings about Plaintiff's impairment. What the SOAP Notes do consistently show, however, is that Plaintiff's constant underlying complaint is that she is unable to focus and read after a few minutes of looking at a page because of double vision. (A.R. 375, 379-380, 384).

The SOAP Notes further reveal that Plaintiff's condition was deemed "active" and this designation precluded Plaintiff from undergoing surgery for her condition. (A.R. 360, 366,

22

384).   In the July 10, 2003, SOAP Note Defendant specifically notes that surgery is suggested but an operation cannot be done while Plaintiff's condition is in the active phase. (A.R. 360).  In the April 27, 2004, SOAP Note, Defendant again notes that thyroid ophthalmopathy can resolve or progress rather quickly, and as Plaintiff's diplopia is noted to be intermittent, surgery would not be planned until her condition stabilized and a true degree of muscular involvement was determined.  (A.R. 366).  However, on July 26, 2005, Defendant writes that Plaintiff is not a candidate for surgery, noting that this suggests her condition is not "of the severity that would require surgical intervention." (A.R. 369).

Several SOAP Notes indicate that Plaintiff's condition will either "level off or get worse" or is "chronic and will not improve." (A.R. 384, 390).   In other SOAP Notes, Defendant notes that the medical data supports impairment that would prevent Plaintiff from returning to her regular occupation. (A.R. 358, 361, 363).  However, in other SOAP Notes Defendant concludes that the medical data does not support a severe or disabling impairment. (A.R. 369, 370).

### E. The Court's Conclusions

Based on a *de novo* review of this case, the Court finds that Defendant's decision to deny Plaintiff benefits was wrong.  *De novo* review essentially requires the Court to act as an insurance adjustor and substitute its judgment for the judgment of the claim's administrator.  A decision is "wrong" if a court disagrees with the administrator's decision. See Williams v. BellSouth Telecommuns., Inc., 373 F.3d 1132, 1138 (11th Cir. 2004).

23

The Court bases its decision primarily on five factors: 1) Plaintiff's chief complaint - inability to read due to double vision - remained constant and is supported by objective medical evidence throughout the Administrative Record; 2) the "active" state of Plaintiff's thyroid ophthalmopathy precluded surgery during the time frame contained in the Administrative Record; 3) Defendant appears to have cherry-picked only favorable information from the Administrative Record to support its denial of benefits; 4) Defendant's reliance on the opinions of Dr. Fallon and Dr. Gizzi is unwarranted because neither Dr. Fallon's nor Dr. Gizzi's opinions contain detailed objective support for their conclusions that Plaintiff is not disabled; and, 5) the materials Plaintiff submitted in support of her claim were generated by doctors specializing in treating patients with ophthalmic problems like Plaintiff's or came from an expert who actually met with Plaintiff and conversed with her treating physicians.

Having concluded that Defendant's decision was wrong, the Court now must determine if the decision to deny LTD benefits was nonetheless "reasonable." An administrator's decision to deny benefits is "reasonable" when "there was a reasonable basis for the decision, based upon the facts known to the administrator at the time the decision was made." Jett v. Blue Cross and Blue Shield of Ala., 890 F.2d 1137, 1139 (11th Cir. 1989). Despite this deferential standard, the Court finds that Defendant's denial of Plaintiff's LTD claim was not reasonable.

Defendant's denial of Plaintiff's LTD claim appears to be based on three factors: 1) the fact that Plaintiff was denied SSDB; the objectively unsubstantiated conclusions of Dr.

Fallon and Dr. Gizzi; and, 3) Defendant's unsubstantiated belief that because Plaintiff's condition could not be treated with surgery it was not serious.

Defendant claims that of the evidence presented that Plaintiff is not totally disabled the "most telling" are the SSA's denial of Plaintiff's initial benefits claim and appeal. Defendant informs the Court that the SSA is required to apply the treating physician rule, in which the opinions of a claimants' treating physicians are afforded deference. Defendant notes that even with this extra deference, the SSA concluded Plaintiff was not disabled during the same time period as Defendant's administration of Plaintiff's claim. Defendant concludes that this finding "should serve as persuasive evidence that [Plaintiff] was not totally disabled. And that [Defendant's] decision to deny her claim was not *de novo* wrong." (Dkt. 31 at p. 20). The Court is not persuaded. Disability determinations under Social Security regulations are not dispositive of disability determinations under an ERISA-covered plan. Barchus v. Hartford Life and Accident Ins. Co., 320 F. Supp. 2d 1266 (M.D. Fla. 2004) (citing to Paramore v. Delta Air Lines, Inc., 129 F.3d 1446, 1452, n.5 (11th Cir. 1997).

Defendant admits that different standards of disability are applied to Plaintiff's claim under the LTD Plan and by the SSA. Review of the SSA's denial language makes clear that a very different standard is used by the SSA. The SSA based its denial of Plaintiff's disability claim on her receipt of treatment for her condition, ability to perform daily activities without assistance,[17] and ability to work in an occupation that does not require

---

[17] Plaintiff's ability to perform daily activities is questionable based on her qualified responses to the VOC Form. However, Plaintiff's ability to perform daily activities does not mean necessarily that she can function effectively at work.

heavy lifting. (A.R. 251, 233). In addition, Plaintiff makes clear in her Response to Defendant's Motion for Summary Judgment that she has "not gone through all of the formal processes and appeals to reach an absolute final decision by SSA." (Dkt. 42 at p. 13). The fact that the SSA determination is not final further minimizes its persuasiveness.

Dr. Fallon's and Dr. Gizzi's opinions are contained in the Administrative Record. Dr. Fallon's "opinion" is no more than a summary of Dr. Fallon's conversation with Claim's Manager, Ms. Gambino in which Dr. Fallon concludes that "severe or disabling impairment related to the [Plaintiff's] complaints is not supported by the medical documentation."(A.R. 369). Dr. Gizzi's opinion that Plaintiff's condition would only slow her reading ability by 25% and that "no other functional impairments are expected" (A.R. 146) is conclusory and based on only a paper review of Plaintiff's medical records and SOAP Notes. Neither of these doctors' opinions contain any references to objective support data.

Dr. Gizzi's finding that Plaintiff's contradiction should impair her reading by 25% does not address Mr. Gray's finding that Plaintiff's condition made both the act of reading and reading comprehension difficult for Plaintiff. The inability to comprehend what you read is a severe functional impairment that deserved more attention from both Dr. Gizzi and Defendant. Plaintiff's job required her to read 90% of her workday. If Plaintiff were unable to read and comprehend what she was reading she would be unable to perform her old occupation and might well be precluded from performing any occupation.

Defendant essentially relied on the opinions of two physicians who are paid directly or indirectly by Defendant. Upon receipt of these opinions, Defendant should have at least

26

made an effort to determine the objective evidence within the record on which these doctors based their opinions.  Defendant's reliance on the opinions of its paid doctors seriously calls into question the reliability of these doctors' analyses and ultimate conclusions.

The Court understands that Defendant is not "required to conduct a fishing expedition in search of evidence to support a speculative claim." <u>Anderson v. Unum Life Ins. Co. of America</u>, 414 F. Supp. 2d 1079, 1108 (M.D. Ala. 2006) (internal citations omitted). However, in this case, where the opinions of Plaintiff's treating physicians clearly support her claim of disability, Defendant's failure to conduct such an investigation is unreasonable. This is especially true when Plaintiff's treating physicians, whose findings support Plaintiff's disability, are specialists in treating Plaintiff's condition and Defendant's are clearly not.

Defendant's denial of benefits cannot be deemed reasonable when it appears that denial is based on a selective review of the evidence and made without careful consideration of contrary medical opinions.  Most troubling is Defendant's complete failure to substantiate the conclusory opinions issued by the in-house and record reviewing physicians in its employ.

The Court acknowledges that Defendant does not have to apply the "treating physicians rule" and accord *per se* special evidentiary weight to the opinions of Plaintiff's treating physicians.  However, "[p]lan administrators may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." <u>Black & Decker Disability Plan v. Nord</u>, 123 S.Ct. 1965 (2003).  In elevating the opinions of Dr. Fallon and Dr. Gizzi, Defendant did just that.

Throughout the Administrative Record, Plaintiff's treating physicians refer to her disease as "active." When thyroid ophthalmopathy is active, surgery is not an option. Review of the SOAP Notes makes clear that Defendant was aware that surgery was not an option because Plaintiff's disease was "active." In one SOAP Note, Ms. Gambino appears to want more information about the active state of plaintiff's disease. (A.R. 365). It does not appear that Ms. Gambino actually sought any further information. This is made clear in the July 26, 2005, SOAP Note, in which Ms. Gambino and Dr. Fallon write that Plaintiff is not a candidate for surgery because her condition is not "of the severity that would require surgical intervention." (A.R. 369). Dr. Gizzi repeats this assessment in his opinion writing Plaintiff's "condition is not serious enough to warrant surgery...." (A.R. 146). This conclusion is contrary to the medical evidence and unreasonable. Based on the medical evidence presented in the Administrative Record, the severity of Plaintiff's condition cannot logically be tied to Plaintiff's inability to undergo surgery.

Defendant later relies on Plaintiff's inability to undergo surgery as a basis for denying her claim. The Denial Letter reads in pertinent part that "[b]oth Dr. Levine and Dr. Shmunes consistently note throughout the records that you are not a candidate for corrective surgery at this time." (A.R. 67). Defendant does not discuss the active state of plaintiff's condition as the reason surgery is not an option. Defendant's failure to seek clarification about the active state of Plaintiff's disease and reliance on it as a basis for denying her claim is unreasonable.

Because the Court finds that Defendant's decision to deny Plaintiff LTD benefits was both wrong and unreasonable, the inquiry ends here and summary judgment for Plaintiff on the issue of entitlement to LTD benefits is appropriate.

## V.   Conclusion

For the reasons above, the Court **ORDERS** that Plaintiff's Motion (Dkt. 41) is **GRANTED**; the Partial Motion (Dkt. 26) is **DENIED**; and, Defendant's Motion for Summary Judgment (Dkt. 31) is **DENIED**.   Plaintiff's LTD benefits were wrongfully terminated.   Plaintiff is to be reinstated to the LTD Plan and awarded past due benefits from the benefit termination date.

This case is remanded to Defendant for calculation of Plaintiff's LTD benefits.   The Court will retain jurisdiction over the case to resolve any disputes over the amount of benefits owed, to determine if Plaintiff is entitled to prejudgment interest, and to address any disputes arising from the award of fees and costs.   Upon the ultimate conclusion of this case, if the parties are unable to agree on the attorney's fees owed to Plaintiff, Plaintiff shall file a Motion for Attorney's Fees with all evidentiary support for those fees no later than the time allowed under the Local Rules.

**DONE AND ORDERED** in Chambers in Jacksonville, Florida on this 10th day of October 2007.

JOHN H. MOORE II
United States District Judge

29

Copies to:    John V. Tucker, Counsel for Plaintiff
                Clifford L. Rosin, Counsel for Defendant